**Andrew A. DOWNS and Maria Downs, Plaintiffs–Appellants,**

v.

**PERSTORP COMPONENTS, INC., and ICI Americas, Inc., Defendants–Appellees.**

No. 00–5507.

United States Court of Appeals, Sixth Circuit.

Jan. 4, 2002.

Before NORRIS and BATCHELDER, Circuit Judges; GWIN, District Judge.*

## OPINION

NORRIS, Circuit Judge.

Andrew A. Downs and Maria Downs brought suit against defendants. Perstorp Components, Inc., ("Perstorp") and ICI Americas, Inc., ("ICI") for injuries allegedly suffered by Andrew Downs as a result of an exposure to Rubiflex SI 30690, a chemical product manufactured by ICI. The district court granted summary judgment to defendants. We affirm.

### I.

In 1995, Perstorp purchased Rubiflex, which is used in the production of foam insulation, from ICI. Another company, SurfAir, was hired to transport the Rubiflex to Perstorp's operation in Tennessee. Downs reported that the plane chartered to ship the containers of Rubiflex was too small. JoAnn Holland, a SurfAir employee, then contacted Jayne Collyar, a Perstorp representative, about the problem. Collyar suggested repackaging the Rubiflex in smaller containers. Holland relayed this suggestion to Downs, who expressed some concern about breaking the seal on the container because he was afraid its contents might be hazardous. Holland told Downs that Rubiflex was not referenced in a book she had consulted on hazardous materials, and Downs proceeded to repackage the Rubiflex.

* The Honorable James S. Gwin. United States District Judge for the Northern District of Ohio, sitting by designation.

During the repackaging attempt. Rubiflex splashed out of the containers and onto Downs' arms and face. He experienced a burning sensation on his skin and contacted Holland to report the problem. After checking with Collyar, Holland assured Downs that exposure to the chemical was safe.

In December of 1995. Downs began noticing neurological symptoms and subsequently sought treatment from Dr. Kaye H. Kilburn. Dr. Kilburn diagnosed plaintiff with "chemical encephalopathy" and, after extensive testing, concluded that the cause of his condition was the exposure to Rubiflex.

In June 1996, plaintiffs instituted this diversity action. The complaint sought recovery against ICI based upon the Tennessee Product Liability Act and against Perstorp because one of its representatives negligently misrepresented the danger associated with exposure to Rubiflex.

The district court entered a discovery order requiring parties to submit expert-witness reports and disclosures required by Federal Rule of Civil Procedure 26(a)(2) by a certain date.[1] When plaintiffs failed to submit the required Rule 26(a) reports for Dr. Kilburn and another identified expert, Thomas J. Callender, M.D., by June of 1998, defendants moved to compel production of the reports. Plaintiffs ultimately produced Dr. Kilburn's report but failed to submit a report from Dr. Callender.

After defendants moved to exclude any testimony by expert witnesses for whom plaintiffs had not produced a report, the parties agreed to an order stipulating that Dr. Callender would not offer testimony on causation. With respect to Dr. Kilburn,

defendants moved to exclude his testimony on the ground that it failed to satisfy the standards for scientific testimony outlined in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The magistrate judge conducted a *Daubert* hearing and granted defendants' request to exclude Dr. Kilburn's testimony. The district court affirmed the exclusion of Dr. Kilburn's testimony.

At this point, defendants moved for summary judgment on the ground that plaintiffs lacked evidence of causation. In response, plaintiffs argued that they should be relieved of the restrictions placed on Dr. Callender's testimony by the earlier agreed order so that he could testify on the issue of causation. The district court concluded that plaintiffs were bound by the agreed order, and that, without the testimony of doctors Kilburn or Callender, plaintiffs lacked any evidence of causation. Accordingly, the court granted summary judgment to defendants.

## II.

We review the district court's decision to exclude the testimony of plaintiffs' expert witnesses for abuse of discretion. *See Nelson v. Tennessee Gas Pipeline Co.,* 243 F.3d 244, 248 (6th Cir.2001). We review the district court's grant of summary judgment de novo. *See Smith v. Ameritech,* 129 F.3d 857, 863 (6th Cir.1997).

### A. Exclusion of Dr. Kilburn's Testimony

Plaintiffs argue that Dr. Kilburn's testimony meets the standard of Federal Rule of Evidence 702 for the admission of expert testimony, as well as the criteria articulated by the Supreme Court in *Daubert*

---

**1.** Rule 26(a)(2)(B) requires that the disclosure of the identity of "a witness who is retained or specially employed to provide expert wit-

ness testimony in the case … be accompanied by a written report prepared and signed by the witness." FED. R. CIV. P. 26(a)(2)(B).

for assessing the admissibility of scientific evidence under Rule 702.

### 1. *Daubert* Standard

In *Daubert*, the Supreme Court held that the Federal Rules of Evidence provide the standard for admitting expert scientific testimony and require that such testimony must be both relevant and reliable. *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786. The Court explained that "in order to qualify as 'scientific knowledge.' an inference or assertion must be derived from the scientific method. Proposed testimony must be supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known." *Id.* at 590, 113 S.Ct. 2786. In assessing the admissibility of expert scientific testimony, the trial judge must conduct "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93, 113 S.Ct. 2786. In *Daubert* the Court identified several factors that may be included in this inquiry but emphasized that the inquiry is "a flexible one." *Id.* at 594, 113 S.Ct. 2786. These factors include whether the theory or technique can be and has been tested, has been subject to peer review and publication, has a known potential error rate, and is generally accepted by the scientific community. *Id.* at 593–94, 113 S.Ct. 2786.

After careful review of the magistrate judge's opinion and the arguments made by the parties, we are convinced that the magistrate judge did not abuse his discretion in excluding Dr. Kilburn's testimony because his conclusions were not based on valid scientific methodology.

### 2. Dr. Kilburn's Methodology

■ The magistrate judge identified numerous "red flags" raised by Dr. Kilburn's proposed testimony. Among those that the magistrate judge identified were: (1) Dr. Kilburn's methodology is not accepted by the medical community; (2) he extrapolated results from unrelated chemical compounds in forming his conclusions; (3) he failed to test his hypothesis; and (4) he reached a conclusion before conducting any research.

In addition, the magistrate judge discussed problems with Dr. Kilburn's methodology in light of testimony by defendants' expert witnesses who described commonly accepted methods for conducting a toxicological investigation. The magistrate judge highlighted the fact that, at the time he diagnosed Andrew Downs, Dr. Kilburn was not aware of the constituent components of Rubiflex[2] and did not know the amount of Rubiflex to which Downs had been exposed. The magistrate judge also noted that Dr. Kilburn testified that he had found no scientific literature suggesting that Rubiflex could lead to neurological problems and had not conducted any testing himself to determine the potential effects of exposure to Rubiflex or its components. We agree that these represent fundamental flaws in the methodology underlying Dr. Kilburn's opinion that Rubiflex caused Downs' neurological problems.

The most obvious problem with Dr. Kilburn's methodology is that he never identified the component or components in Rubiflex that were responsible for Downs' condition. Plaintiffs argue that it was sufficient that Dr. Kilburn identified Rubiflex as an epoxy and determined that it con-

---

**2.** Dr. Kilburn did eventually familiarize himself with the constituent components of Rubiflex. His original conclusion, however, was based simply on Downs' symptoms and the fact that he had been exposed to Rubiflex.

tains two substances identified as toxic in scientific literature. In his testimony, however, Dr. Kilburn admitted that he could not identify which components of Rubiflex caused the various neurological problems that he had diagnosed Downs as having, and that it would be simply speculation to attempt to identify the specific effects of these toxins. Moreover, Dr. Kilburn stated that his primary basis for concluding that Rubiflex is toxic was his observation of Downs' condition.

Another significant flaw in Dr. Kilburn's method was the fact that he made no attempt either to determine the dose to which Downs was exposed or to identify independently what dose of Rubiflex, or the toxins he had identified in Rubiflex, is necessary to cause the conditions that he observed in Downs. Therefore, Dr. Kilburn was unable to state whether Downs had received a dose sufficient for Rubiflex to have caused his condition and was unable to state what minimum dose would be required to do so.

In essence, Dr. Kilburn's methodology primarily involved reasoning backwards from Downs' condition and, through a process of elimination, concluding that Rubiflex must have caused it. Dr. Kilburn's response to the question of whether he had conducted any testing to calculate Downs' potential exposure summarizes his methodological approach: "We know we had an effect, we know that Rubiflex was there, we've excluded all other possibilities.... I see nothing else needed."

As evidenced by the fact that he was unaware of the components of Rubiflex when he came to his initial conclusion about what caused Downs' condition, Dr. Kilburn's method does not include any reference to existing scientific knowledge or any attempt to test independently the validity of his conclusion. In effect, Dr. Kilburn simply formed a hypothesis based on

his observations of Downs and what he knew of Downs' medical history. He failed to take the necessary step of either supporting his hypothesis through reference to existing scientific literature or conducting his own tests to prove its reliability. *See Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir.2000) (stating that *"Daubert* and its progeny make clear that '[p]roposed [expert] testimony must be supported by appropriate validation.'") (quoting *Daubert*, 509 U.S. at 591, 113 S.Ct. 2786). In light of these methodological shortcomings, the magistrate judge did not abuse his discretion in determining that Dr. Kilburn's testimony should be excluded because it lacked scientific reliability.

**B. Exclusion of Dr. Callender's Testimony**

■ Plaintiffs argue that they should be relieved of the limitations in the agreed order that prohibited Dr. Callender from testifying on the issue of causation because, at the time it was entered, Dr. Kilburn's testimony had not yet been challenged. They contend that they agreed to limit Dr. Callender's testimony only because they assumed Dr. Kilburn would be permitted to testify on the issue of causation.

Plaintiffs' position is undermined by the fact that they were on notice of the potential exclusion of Dr. Kilburn's testimony for nearly fifteen months before they requested relief from the order. As the Supreme Court recently observed, "It is implausible to suggest, post-*Daubert*, that parties will present less than their best expert evidence in the expectation of a second chance should their first try fail." *Weisman v. Marley Co.*, 528 U.S. 440, 442, 120 S.Ct. 1011, 145 L.Ed.2d 958 (2000).

"District courts have broad discretion to exclude untimely disclosed expert-witness testimony." *Pride*, 218 F.3d at 578. In

this case, the district court refused to grant the plaintiffs relief from an agreed order prohibiting Dr. Callender from testifying on the issue of causation because, at the time they agreed to this limitation, plaintiffs faced the very real threat that the magistrate judge would exclude Dr. Callender's testimony altogether due to their failure to produce an expert witness report. In view of that reasoning, we are unable to say that the district judge abused his discretion in refusing to relieve plaintiffs of the terms of their agreement.

## C. Summary Judgment

█ The district court correctly concluded that, without admissible expert testimony on causation, no reasonable jury could find for plaintiffs because Tennessee law requires proof of causation for both strict liability and negligence actions. *See, e.g., Caldwell v. Ford Motor Co.,* 619 S.W.2d 534, 539 (Tenn.Ct.App.1981) (Tennessee strict liability statute requires a showing that the product caused the injury); *Dillard v. Vanderbilt Univ.,* 970 S.W.2d 958, 960 (Tenn.Ct.App.1998) (negligence claim requires establishing causation in fact).

## III.

The district court's orders excluding the testimony of Dr. Kilburn, denying plaintiffs' request for relief from the terms of the agreed order, and granting summary judgment for defendants are affirmed.