OPINION
BOGGS, Circuit Judge:
Plaintiff-Appellant ASK Chemicals (ASK), the assignee of a now-expired Japanese patent, appeals the district court’s award of summary judgment to the defendant, Computer Packaging, Inc. (CPI), in a breach-of-contract suit claiming damages resulting from CPI’s failure to maintain the patent on ASK’s behalf. The district court granted CPI’s motions to exclude the report of ASK’s sole expert witness and for summary judgment. ASK appeals both the exclusion of the expert report and the grant of summary judgment. For the reasons set forth below, we affirm.
I
This case concerns the possible damages owed by defendant CPI to ASK for CPI’s breach of contract when CPI failed to pay the amounts required under Japanese law to maintain ASK’s Japanese Patent No. 3,278,168 (the '168 patent).
In 1997, Ashland, a chemical company, applied for a Japanese patent to protect the method by which it produced a particular type of riser sleeve that was unique in its employment of a “cold-box” manufacturing process. Riser sleeves are used throughout the foundry industry to improve the quality of metal castings. As the liquid metal cools in the hollow of a casting, it solidifies and shrinks. The last part of the casting to cool within the hollow will often form a void where remaining shrinkage occurs. The result is a defective metal casting. Riser sleeves, essentially metal reservoirs external to the casting, prevent this potential defect by providing additional liquid metal during cooling so that voids form in the riser, not in the casting itself.
The '168 patent issued on April 30, 2002 and was assigned by Ashland to ASK on November 30, 2010.
A version of the riser sleeve, ASK’s “Exacteast” riser sleeve, is covered by a number of European and American patents. Although Exacteast riser sleeves have sold successfully in both the Americas and Europe, ASK’s (and its predecessor’s) efforts in Japan were less fruitful: a factory fire in 2003 put an end to its initial penetration of the Japanese market and *508 ASK did not again focus on Japan until 2008, when it began developing Japanese clients, a long and arduous process requiring- the commitment of significant time, effort, and money. At the time the '168 patent lapsed, ASK had no sales of related technology in Japan.
The parties do not dispute the basic facts regarding the assignment of the patent, the lapse of the patent, or the cause of its lapse. The sole issue before the district court was the question of what damages CPI might owe to ASK for the breach.
Ashland, while still the holder of the '168 patent, had hired CPI to pay the annual fees due on its patents in Japan. After the assignment of the '168 patent to ASK, CPI continued in its role maintaining the patent. Had the patent been properly maintained under Japanese law, it would have expired on March 21, 2017. But the patent was not maintained. CPI failed to make the ninth necessary payment, due in January 2010. Six months later, at the end of Japan’s statutory grace period, the patent lapsed irretrievably.
On July 20, 2012, ASK filed a complaint against CPI in the United States District Court for the Southern District of Ohio, requesting compensatory, direct, expectancy, and prospective damages under two counts: breach of contract and breach of implied-in-fact contract. CPI filed an answer on April 5, 2012, in which it admitted that it had failed to pay the required fees and that, as a result of its failure, the patent lapsed. Following the completion of discovery, CPI submitted two contemporaneous motions: (1) to exclude the report of ASK’s expert witness, Brian Russell, and (2) for summary judgment.
Following briefing and oral argument, the district court granted CPI’s motion to exclude the report proffered by ASK’s sole expert witness. The district court subsequently granted CPI’s motion for summary judgment. It held that, in the absence of the report, there were no further issues of material fact for a jury, and ASK had failed to demonstrate with reasonable certainty the amount of lost profits resulting from the breach of contract. ASK timely appealed.
II
This court reviews the district court’s exclusion of the testimony of an expert witness, as it reviews all evidentiary rulings, for abuse of discretion. See Gen. Elec. Co. v. Joiner, 522 U.S. 136, 143, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); Pride v. BIC Corp., 218 F.3d 566, 575 (6th Cir.2000). The district court abuses its discretion when it “relies on clearly erroneous findings of fact, improperly applies the law, or employs an erroneous legal standard.” Barner v. Pilkington N. Am., Inc., 399 F.3d 745, 748 (6th Cir.2005) (internal quotation marks and alterations omitted).
We review the district court’s grant of summary judgment de novo. See Plant v. Morton Int'l, Inc., 212 F.3d 929, 933 (6th Cir.2000). District courts may grant summary judgment “if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” Fed. R.Civ.P. 56(a). In assessing a movant’s claim to summary judgment, the court draws all justifiable inferences in favor of the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Though the moving party bears the initial burden of showing that there is no genuine dispute of material fact, after the movant makes such a showing, the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a *509 genuine dispute of material fact for trial. Id. at 256, 106 S.Ct. 2505.
Ill
On appeal, ASK advances two issues. First, it argues that the district court erred in granting CPI’s motion to exclude the expert testimony of Brian Russell because his methods were unreliable. Second, ASK argues that the district court erred in granting summary judgment to CPI because, even if Russell’s report was properly excluded, ASK still presented sufficient evidence to withstand summary judgment.
A
The district court granted CPI’s motion to exclude the expert report of Mr. Russell because, although the court decided that he was qualified as an expert, it also found his report to be insufficiently reliable.
Testimony of expert witnesses is governed by Rule 702 of the Federal Rules of Evidence. Rule 702 allows an expert witness to provide testimony in opinion form if: “(a) the expert’s scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.” Fed. R.Evid. 702. Rule 702, in concert with other Rules of Evidence, empowers the district court to ensure that the expert’s testimony is both relevant and reliable. See Daubert v. Merrell Dow Pharms., 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The court plays this same gatekeeping function even if the expert’s opinion is “technical,” rather than scientific, in nature. See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). This line of cases governing the district court’s screening of experts seeks to “strike a balance between a liberal admissibility standard for relevant evidence on the one hand and the need to exclude misleading ‘junk science’ on the other.” Best v. Lowe’s Home Ctrs., Inc., 563 F.3d 171, 176-77 (6th Cir.2009).
Though the court found that Mr. Russell had sufficient specialized knowledge to offer evidence as an expert, it found that the other requirements of Rule 702 were not satisfied. Rule 702(b) requires that an expert’s opinion be “based on sufficient facts or data.” Fed.R.Evid. 702(b). Rule 702(c) requires that the expert’s testimony is the product of both “reliable principles and methods.” Fed.R.Evid. 702(c). As the Daubert Court articulated, the district court must concentrate “solely on principles and methodology, not on the conclusions that they generate.” Daubert, 509 U.S. at 595, 113 S.Ct. 2786. However, “[a] district court is not required to admit expert testimony ‘that is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.’ ” Nelson v. Tenn. Gas Pipeline Co., 243 F.3d 244, 254 (6th Cir.2001) (citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)).
In Nelson, this court found such an analytical gap. The plaintiff proffered the testimony of a board-certified neurologist and psychologist regarding the neurological effects that result from exposure to a particular chemical. Although the magistrate judge found that the neurologist was properly credentialed to serve as an expert witness, the magistrate judge correctly refused to admit the expert’s opinion because “the methodology by which [the expert] reached his opinion concerning causation *510 [was not] found reliable.” Nelson, 243 F.3d at 254. The court determined that, although the tests used to assess exposure to the chemicals were generally accepted, the expert “admitted no knowledge concerning the actual exposure of the ... plaintiffs ... or the temporal relationship between their exposure and symptoms.” Ibid. Because the leap between the limited data and the expansive conclusion in the doctor’s testimony was too great for the evidence to be reliable, we determined that the judge did not abuse his discretion in excluding the doctor’s testimony.
The situation in this case is similar to that in Nelson. The district court found that the experience, education, and professional qualifications of ASK’s witness, Russell, properly qualified him as an expert. Like the magistrate judge in Nelson, the district court here did not balk at the witness’s expert credentials, but only at his methods. The district court in this case found that Russell based his calculations on fundamentally flawed data and impermissible methods. Russell determined the amount of lost profits, in part, from a marketing plan that ASK produced a decade-and-a-half ago, which only covered the years 1998 to 2003, and from which he extrapolated future lost profits during the years 2013 to 2022-all without explaining his method or assumptions. Russell also relied on ASK’s 2011 global-market analysis, which estimated the riser-sleeve markets of various regions of the world, including Asia, but that did not provide data about Japan specifically. Thus, according to the district court, it could not serve as a reasonable basis to estimate profits in Japan. For Russell to have demonstrated lost profits to a reasonable certainty he would have required, at a minimum, the following data: “(1) the size of the Japanese riser sleeve market; (2) ASK’s market penetration; (3) ASK’s sales; and (4) ASK’s direct costs.” In the absence of these basic, objective figures, any projection or calculation made by Russell of future lost profits would, like the calculations of the neurologist with no direct knowledge of patient exposure in Nelson, involve “too great an analytical leap.” See Nelson, 243 F.3d at 254.
Of course, “an expert may rely on otherwise inadmissible hearsay evidence in forming his opinion if the facts and data upon which he relies are of a type reasonably relied upon by experts in his field.” Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc., 125 F.3d 1176, 1182 (8th Cir.1997). But Russell’s wholesale adoption of Plaintiffs estimates, without revealing or apparently even evaluating the bases for those estimates, goes beyond relying on facts or data and instead cloaks unexamined assumptions in the authority of expert analysis. “As ‘gatekeeper,’ the trial judge is imbued with discretion in determining whether or not a proposed expert’s testimony is admissible, based on whether it is both relevant and reliable.” Johnson v. Manitowoc Boom Trucks, Inc., 484 F.3d 426, 429 (6th Cir.2007) (quoting Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)). On the facts of this case, and particularly in light of the unreliability of the evidence underlying Plaintiffs estimates, the district court was within its discretion to determine that the lack of independent verification or analysis of the revenue projections rendered Russell’s opinion unreliable. Where an expert merely offers his client’s opinion as his own, that opinion may be excluded. See, e.g., CIT Grp./Bus. Credit, Inc. v. Graco Fishing & Rental Tools, Inc., 815 F.Supp.2d 673, 677 (S.D.N.Y.2011) (rejecting expert testimony based on “the con-clusory statements of [the party’s management] and not on his independent evaluation of the facts”); King-Indiana *511 Forge, Inc. v. Millennium Forge, Inc., No. 1:07-cv-00341-SEB-SML, 2009 WL 3187685, at *2 (S.D.Ind. Sept. 29, 2009) (“When an expert’s proffered opinion merely parrots information provided to him by a party, that opinion is generally excluded.”).
Given the unreasonableness of Russell’s methods, the faulty and incomplete data upon which they were based, and the general unreliability of the evidence, the district court did not abuse its discretion in excluding Russell’s testimony.
B
The district court granted summary judgment to CPI, holding that, in the absence of Russell’s expert report, there was insufficient evidence on the record to create a genuine dispute of material fact.
Under Ohio law, consequential damages, including damages for lost profits, are available in suits for breach of contract. A plaintiff can recover lost profits if it can show that “(1) profits were within the contemplation of the parties at the time the contract was made, (2) the loss of the profits is the probable result of the breach of contract, and (3) the profits are not remote and speculative and may be shown with reasonable certainty.” City of Gahanna v. Eastgate Props., Inc., 36 Ohio St.3d 65, 521 N.E.2d 814, 817 (1988). However, in order for a plaintiff to recover lost profits, “the amount of the lost profits, as well as their existence, must be demonstrated with reasonable certainty.” Id. at 818 (emphasis added). In other words, damages are not awarded merely on a plaintiffs assertion “that it would have made a particular amount of profits, but [the plaintiff] must prove lost profits with calculations based on facts.” UZ Engineered Prods. Co. v. Midwest Motor Supply Co., Inc., 147 Ohio App.3d 382, 770 N.E.2d 1068, 1083 (2001).
We do not address the question of whether lost-profits damages never may be proven by comparison to a plaintiffs performance in an existing market. But in the case of ASK’s complaint, neither of the first two elements is in doubt. Profits were certainly in the contemplation of the parties at the time the contract was made-CPI was, after all, in the business of administering the patent-management programs of intellectual-property owners. Similarly, there is no dispute over the second element, causation. If ASK had suffered lost profits as the result of the lapse of the '168 patent, it would have been because of CPI’s (admitted) failure to pay the required annual payment.
The parties dispute only the final requirement, that the lost profits be shown to a “reasonable certainty.” In demonstrating lost profits, Ohio law does not require plaintiffs to prove the amounts lost with absolute precision. The evidence “need only be reasonable, not specific.” Charles R. Combs Trucking, Inc. v. Int’l Harvester Co., 12 Ohio St.3d 241, 466 N.E.2d 883, 887 (1984). But demonstrating lost profits to a reasonable certainty requires the use of detailed evidence, for example, “expert testimony, economic and financial data, market surveys and analy-ses, business records of similar enterprises, and the like.” AGF, Inc. v. Great Lakes Heat Treating Co., 51 Ohio St.3d 177, 555 N.E.2d 634, 640 (1990) (citing Restatement (Second) of Contracts § 352, cmt. b). The evidence submitted must be sufficient to support calculations establishing the amount of lost profits: “Unless the figure is supported by calculations based on facts available or in evidence, the courts will properly reject it as speculative or uncertain.” Endersby v. Schneppe, 73 Ohio App.3d 212, 596 N.E.2d 1081, 1084 (1991).
*512 A review of four Ohio cases — one of which established lost profits and three of which did not — demonstrates what constitutes non-speculative, reasonably certain lost profits. First, lost profits were awarded under Ohio law in Michigan Millers Mut. Ins. Co. v. Christian, 153 Ohio App.3d 299, 794 N.E.2d 68 (2003), a case in which the evidence demonstrated the amount of lost profits to a reasonable certainty. Among the types of evidence were testimony regarding market conditions, records of company earnings during the time period in question, records of company earnings during identical periods in the preceding years, and compilations of customer receipts and business transaction records. Id. at 77. From this evidence, a simple computation comparing the profits of one period with the profits of another period at the same time of year in the same location in the same enterprise allowed the establishment of lost profits to a reasonable certainty.
Second, and in contrast, in Homes by Calkins, the plaintiff failed to demonstrate lost profits to a reasonable certainty because the claim was necessarily unprovable and speculative. In a suit for damages based on a vendor’s failure to have a deed restriction removed, the plaintiff, a real-estate developer, was delayed in building a development by the 11 months necessary to clear the property’s title following sale. Reviewing his evidence, the trial court found, and the Court of Appeals of Ohio affirmed, that since neither the plaintiff nor the court “could reasonably estimate how many units [the plaintiff] could have sold, if it could have sold any,” the plaintiff failed to demonstrate lost profits to a reasonable certainty. Homes by Calkins, Inc. v. Fisher, 92 Ohio App.3d 262, 634 N.E.2d 1039, 1045 (1993). Since the demonstration of lost profits in a new business is necessarily more speculative, such demonstrations “receive greater scrutiny because there is no track record upon which to base an estimate.” Andrew v. Power Mktg. Direct, Inc., — Ohio App. —, 978 N.E.2d 974, 992 (2012).
Third, in Ace Vending Co. v. Davidson, 8 Ohio App.3d 328, 457 N.E.2d 341 (1982), the plaintiff failed to demonstrate its lost profits to a reasonable certainty because the evidence it submitted was based on an inapposite comparison. Ace Vending had several vending machines that were unlawfully detained after the closing of the pizzeria in which they were installed. The evidence submitted consisted of little more than the testimony of Ace Vending’s office manager as to the average amount of money per week made by the machines during the last two months the pizzeria was open. Since the pizzeria had gone out of business, however, the court rejected this evidence because, following the pizzeria’s closing, the lost profits would necessarily have been limited to the amount of money that the machines would have made at another location had they been timely returned. Ace Vending, 457 N.E.2d at 343.
Finally, in Kosier v. DeRosa, 169 Ohio App.3d 150, 862 N.E.2d 159 (2006), the court found that the plaintiff failed to demonstrate lost profits where his calculations lacked necessary data. In a suit for breach of contract to install new flooring into a house, the plaintiff submitted evidence as to his labor costs, but provided no information as to how many hours of work would have been required to complete the contract. The Ohio Court of Appeals held that, in the absence of such evidence, it was not possible to establish the amount of profits lost to a reasonable certainty. See Rosier, 862 N.E.2d at 166.
In this case, ASK’s evidentiary submissions suffer from each of the defects outlined in the three Ohio cases above. Like the plaintiff in Homes by Calkins, *513 ASK had no track record of riser-sleeve sales in Japan aside from the decade-old effort that had been abandoned following the factory fire. The lack of any reliable track record subjects ASK’s lost-profits calculations to stricter inquiry and increases the difficulty of determining a reasonably accurate figure for lost profits. Though ASK had again taken the initial steps necessary to reintroduce their riser sleeves into Japan (they sought certification from several potential clients and sold test products), they still had almost no sales history and thus any attempt to demonstrate lost profits using riser-sleeve sale projections alone would suffer from a lack of hard data.
ASK’s evidence was also like that in Ace Vending because it sought to establish profits in the Japanese market based on an inapposite comparison with sales in Europe and North America. Having provided sales figures only for North America and Europe and providing virtually no relevant market research on Japan, ASK sought to establish potential future sales and profits by analogizing sales in one region of the world with potential sales in another. Such extrapolation, without more, is insufficient to establish lost profits to a reasonable certainty.
Lastly, ASK’s evidentiary submissions appear to suffer from the same basic fault as in Rosier because the submissions lacked necessary data. As the plaintiff in Rosier failed to provide one of the basic elements necessary to its calculations (the number of hours of labor performed), ASK has failed to give basic data about the Japanese market that would be necessary to make reasonably certain projections of potential future profits. As the district court pointed out, without data on the size of the Japanese market or ASK’s sales and direct costs, it would be virtually impossible to settle on a figure for ASK’s lost profits.
Were the demonstration of the existence of lost profits all that was necessary to overcome a motion for summary judgment, ASK may have had success. Based on the evidence submitted, a jury could very well find that ASK had lost profits because of CPI’s breach. On appeal, ASK provides a painstaking roster of all the evidence placed in the record, including marketing surveys, its 1998 marketing plan, its regional market-share calculations, European and American licenses, and projections of capital costs for the building of a new factory. However, since there is no way that the evidence submitted could lead a court to determine the amount of lost profits to a reasonable certainty, there is no genuine dispute of material fact for a jury. ASK’s evidentiary submissions, even though voluminous, do little to establish a specific sum necessary to meet the standard of a “reasonable certainty.” See City of Gahanna, 521 N.E.2d at 817.
IV
For the reasons above, we AFFIRM the judgment of the district court.