Krystal KING, et al., Plaintiffs,

v.

**ENTERPRISE RENT–A–CAR COMPANY, et al., Defendants.**

No. 03–71778.

United States District Court,
E.D. Michigan,
Southern Division.

Dec. 2, 2004.

Kathleen L. Bogas, Eisenberg & Bogas, Bloomfield Hills, MI, for Plaintiffs.

Diana L. Khachaturian, Dickinson Wright, Detroit, MI, Louis Theros, Lawrence G. Campbell, Kathleen A. Lang, for Defendants.

## ORDER

ROBERTS, District Judge.

### I. INTRODUCTION

This matter is before the Court on four motions: 1) Plaintiffs' Motion for Class Certification; 2) Plaintiff's Motion to Strike Exhibit P Attached to Defendants' Opposition to Plaintiffs' Motion for Class Certification; 3) Defendants' Motion to Strike Dr. Van Wingen's Final Report and to Exclude his testimony; and, 4) Defendants' Motion to Strike Dr. Van Wingen's Reply Report. A hearing was held on October 22, 2004.

The Court: **DENIES** Plaintiff's Motion for Class Certification; **DENIES** Plaintiff's Motion to Strike Exhibit P Attached to Defendants' Opposition to Plaintiffs' Motion for Class Certification; **GRANTS** Defendants' Motion to Strike Dr. Van Wingen's Final Report and to Exclude his testimony; and, deems **MOOT** Defendants' Motion to Strike Dr. Van Wingen's Reply Report.

### II. BACKGROUND

This action is brought by fourteen African–Americans who are or were employed with Enterprise Leasing Company of Detroit ("Enterprise–Detroit").[1] Plaintiffs filed this action against Enterprise–Detroit and its parent corporation, Enterprise Rent–A–Car Company ("ERAC"),[2] on behalf of themselves and other similarly situated individu-

---

1. Krystal King, Catherine Stabler, Chris Lee, Don Spencer, Demetrius Brock, Arthur Henderson, Sandra Bell, Rinell Starks, Monica Bly, Deborah Wells, Lois Wilson, Michelle Wilson, Lorenza Threatt, and Charles Cole.

2. Plaintiffs also named another of ERAC's subsidiaries, MIRAC, Inc., as a Defendant. However, MIRAC was voluntarily dismissed by stipulated order on October 2, 2003.

als.[3] Plaintiffs allege that both Enterprise–Detroit and ERAC discriminated against African–American employees based on their race, in violation of 42 U.S.C. § 1981 and the Michigan Elliott–Larsen Civil Rights Act ("ELCRA"). Specifically, Plaintiffs allege that Defendants engaged in a pattern and practice of discrimination with respect to promotions and terminations.[4]

Enterprise–Detroit is a wholly-owned subsidiary of ERAC. It is also known as "Group 20" and has two main divisions, Daily Rental and Non–Daily Rental. The Daily Rental division generally handles renting automobiles to individual and corporate customers and is subdivided into four geographic regions—D, M, W, and X.[5] The Non–Daily Rental division is subdivided into three functional regions-Region R for car sales (retail sales of automobiles); Region F for fleet services (leasing fleets of cars to corporations); and, Region 9 for certain administrative duties. The parties focus primarily upon Region W in the Daily Rental division.

The organizational structure within the Daily Rental regions is as follows: Each region is subdivided into three to six areas. Each regional area includes a number of Daily Rental branches, and is supervised by an Area Manager. Area Managers are responsible for the business performance of the branches they supervise, and generally are in charge of marketing, hiring, promotions, and employee training. Most branch offices are run by a Branch Rental Manager and sometimes an Assistant Branch Manager.

The positions at Enterprise–Detroit are assigned by levels. In Daily Rental,[6] Level 1 includes Assistant Branch Managers, Management Assistants, and Management Train-ees. The Management Trainee position is entry level, Management Assistants are mid-level, and Assistant Branch Managers hold the highest position within Level 1. Level 2 is the Branch Manager position. Level 3 includes Area Managers, group-level managers, and some department managers. Level 4 includes all officer positions within Enterprise–Detroit.[7]

Per Defendants, although there are some group-wide policies and decision-making tools, managers at the regional, area, and branch levels have discretion to make promotion decisions according to the criteria set by their region. The parties agree that the relevant time frame is from May 1, 1999 through May 31, 2003. Until February or March of 2003, the regional managers for Enterprise–Detroit independently established the promotion procedures within their respective regions. For both the Daily Rental and Non–Daily Rental divisions each region used a variety of objective and subjective criteria to decide promotions. For Daily Rental, the objective criteria varied slightly from region to region, and could include a point system (i.e., "Power Points"),[8] measurement of profitability, customer satisfaction, and overall employee retention. The nature and weight of subjective criteria also varied from region to region, but generally included leadership ability and the capacity to help subordinates perform well. For Non–Daily Rental, the objective criteria were not the same as the Daily Rental criteria because they were based on the specific functions of each job. Subjectively, managers considered things such as an employee's particular strengths, educational background, work experience, leadership skills, success in particu-

---

3. ERAC has a motion to dismiss pending. However, it joins Enterprise–Detroit's motions and briefs in opposition.

4. Plaintiffs also alleged discrimination in transfers and disciplinary actions. During oral argument, however, Plaintiffs abandoned those claims.

5. "Region W, covers Wayne County, Michigan; Region D," covers all of northwestern Ohio, Monroe, Livingston, and Washtenaw counties; "Region M," covers Macomb County; and, "Region X," covers Oakland County.

6. The parties do not make it clear, but it seems that Non–Daily rental utilizes the same Level system, but with different positions at each level.

7. There is also a Level 0, which includes temporary, part-time, or intern positions that are not at issue here.

8. Power points are the total of an individual's sales of collision damage waivers, personal accident insurance, and supplemental liability protection.

lar tasks, and overall performance in various areas.

In February or March 2003, Enterprise–Detroit established guidelines for basic objective and subjective performance expectations for Levels 1 through 3 Daily Rental employees. This included objective and subjective qualifiers for promotions from Management Assistant to Assistant Branch Manager. However, Defendants contend that each region was to implement the guidelines according to the business needs in their respective regions. The Regional Vice Presidents for the Daily Rental regions each state in their affidavits that they were allowed to deviate from the guidelines under certain (unspecified) circumstances, because of the individual nature of the regions and each region's unique business environment. Defendants argue that these guidelines were only in effect for approximately two months of the relevant period, none of the Plaintiffs claims to have been impacted by these guidelines, and there is no statistical analysis by Plaintiffs' expert regarding them. Defendants also point out that the criteria for making promotion decisions depends upon which position the employee holds. For example, entry level Management Trainees in the Daily Rental regions have different job functions than entry level employees in Non–Daily Rental regions. The entry level positions in Non–Daily Rental include: human resource generalist; loss control and accounting; car sales; recruiters; vehicle acquisition coordinators; and, vehicle repair coordinators.

In Daily Rental, promotion decisions within Level 1, from Management Trainee to Management Assistant, are made by the Area Manager. One requirement for advancement that is the subject of Plaintiffs' claims is that the trainee participate in a Management Qualification Interview ("MQI"). The MQI is an oral examination administered by the Area Manager to assess the employee's Daily Rental skills, knowledge, and experience. The substance of these interviews varies between regions, and each region sets certain objective criteria for even allowing an employee to take the MQI. In Region W, from May 1999 to October 2000, in order to take the MQI employees needed 110 Power Points, an average daily insurance rate of $26.00, five corporate leads in the previous month, and a passing grade on the Rental Skills test. From October 2000 through February or March 2003, Region W utilized a performance matrix that purportedly measured both individual and branch objective performance. To take the MQI, Management Trainees had to be in the top 50% in their region according to the matrix. Only Region W used the matrix and it was discontinued after the Enterprise–Detroit February or March 2003 guidelines took effect.

The criteria for promotions above Management Assistant also varies from region to region. Depending on the region, promotion decisions for such positions are allocated between the Area Manager, Regional Rental Manager, and the Regional Vice President.

Despite the objective criteria used in each stage of the promotion process, Plaintiffs contend that the process in actuality is and was entirely subjective. They claim that managers used their subjective discretion against African–American employees to: determine who could sit for the MQI and whether an employee passed it; give poor performance reviews; and, dole out inequitable discipline and discharges. Plaintiffs also claim that managers gave greater assistance to non-African-American employees in preparing for the MQI and deprived African–Americans of equal training opportunities, which resulted in their being assigned lower-level duties. As a result of these alleged inequities, Plaintiffs assert that they were denied opportunities to advance within the company at the same rate as non-African-American employees.

In their motion, Plaintiffs modified their proposed class and now seek to certify a class defined as:

> All black persons who ever held the position of Management Trainee and were in the employment of the Defendant on May 8, 1999, or later.

Pl's Motion at p. 2.[9] Although there is no Management Trainee position in Non–Daily

9. Plaintiffs initially defined the putative class as:

> All African–American persons who are, have

Rental regions, Plaintiffs' proposed class includes both the Daily Rental and Non–Daily Rental regions. Presumably, Plaintiffs' rationale is explained by their assertion that employees in Daily Rental often pursue positions in Non–Daily Rental, and Non–Daily Rental positions are often filled by former Daily Rental employees.

Plaintiffs each worked for Enterprise–Detroit in Region W at some time since 1997. They were each Management Trainees at some point during their careers with Defendants. And, except for Plaintiff Charles Cole, who briefly worked in Car Sales (Non–Daily Rental region R), all of the Plaintiffs worked solely in Daily Rental. Only Plaintiff Demetrius Brock is still employed with Enterprise–Detroit.

For various reasons, Defendants dispute that class certification is the appropriate means of adjudicating Plaintiffs' claims. Defendants also move to strike the reports and testimony of Plaintiffs' statistical expert.

### III. APPLICABLE LAW AND ANALYSIS

#### A. Class Certification

Plaintiffs seek class certification for Defendants' alleged pattern and practice of race discrimination in promotions and discharges. For the reasons stated below, the Court finds that Plaintiffs failed to carry their burden on three of the four factors required for class certification under FRCP 23(a).

Class certification will only be granted if the proposed class satisfies each of the requirements of FRCP 23(a),[10] commonly referred to as numerosity, commonality, typicality, and adequacy of representation, as well as one of the subsections of 23(b). Plaintiffs request certification under 23(b)(2) and/or (3). The party seeking class certification has the burden of proof. *In re Ameri-*

can *Medical Systems, Inc.*, 75 F.3d 1069, 1079 (6th Cir.1996). A district court has broad discretion to certify a class, but it must do so within the framework established in the federal rules. *Id.* A court may not base its decision on the movant's likelihood of success on the merits. *Weathers v. Peters Realty Corp.*, 499 F.2d 1197 (6th Cir.1974). However, a court may still be required to consider the evidence if the pleadings do not adequately state the facts necessary to determine whether Rule 23 prerequisites can be met.

'Mere repetition of the language of Rule 23(a) is not sufficient. There must be an adequate statement of the basic facts to indicate that each requirement of the rule is fulfilled. Maintainability may be determined by the court on the basis of the pleadings, if sufficient facts are set forth, but ordinarily the determination should be predicated on more information than the pleadings will provide.... The parties should be afforded an opportunity to present evidence on the maintainability of the class action.'

*American Medical Systems*, 75 F.3d at 1079, (*quoting Weathers*, 499 F.2d at 1200).

In this case, even assuming that numerosity is met, Plaintiffs failed to show commonality, typicality, or adequacy of representation.

#### i. FRCP 23(a)

##### a. COMMONALITY AND TYPICALITY

To satisfy the commonality requirement, there must be "questions of law or fact common to the class." FRCP 23(a)(2). There only needs to be a single issue common to all class members. *American Medical Systems*, 75 F.3d at 1080. "Consequently, the mere fact that questions peculiar to each individual member of the class remain after the com-

been, or will be employed in Group 20 of Defendants' business operations at any time since May 8, 1999.

First Amended Complaint at ¶ 23.

**10.** FRCP 23(a) states:

(a) *Prerequisites to a Class Action.* One or more members of a class may sue or be sued as representative parties on behalf of all only if

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

mon questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible." *Sterling v. Velsicol Chemical Corp.*, 855 F.2d 1188, 1197 (6th Cir.1988).

The typicality factor is met if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Rule 23(a)(3). "The test for typicality, like commonality, is not demanding ...." *Forbush v. J.C. Penney Co., Inc.*, 994 F.2d 1101, 1106 (5th Cir.1993). The typicality requirement is meant to assure that the class representative is, indeed, representative of the class. "A necessary consequence of the typicality requirement is that the representative's interests will be aligned with those of the represented group, and in pursuing his own claims, the named plaintiff will also advance the interests of the class members." *American Medical Systems*, 75 F.3d at 1082. Typicality may be presumed when the plaintiff's claim "arises from the same event or practice or course of conduct that gives rise to the claims of other class members." *Id.* (*quoting* 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions*, § 3.13, at 3–76 (3d ed.1992)).

■ Plaintiffs have not identified a question of law or fact that is common or typical to the class. Plaintiffs bring their claims under a theory of disparate treatment. Disparate treatment occurs when an employer intentionally treats certain employees less favorably because of their race, color, religion, sex, or national origin. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). To establish a "pattern and practice" of disparate treatment in a class action, Plaintiffs must prove "more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts." *Id.* at 336, 97 S.Ct. 1843. They must show with direct or circumstantial evidence that discrimination was Defendants' "standard operating procedure-the regular rather than the unusual practice." *Id.* Some courts disfavor class certification of disparate treatment claims, because the highly individualized na-

ture of the claims often are not conducive to class treatment. *See Reyes v. The Walt Disney World Co.*, 176 F.R.D. 654, 658 (M.D.Fla. 1998) (*quoting Washington v. Brown & Williamson Tobacco Corp.*, 959 F.2d 1566, 1570 n. 10 (11th Cir.1992)); *Wright v. Circuit City Stores*, 201 F.R.D. 526, 539 (N.D.Ala.2001). However, the fact that class members' factual circumstances differ does not preclude class certification, as long as the differences are unlikely to affect the legal outcome and the members have at least one issue in common. *Bacon v. Honda of America Manufacturing, Inc.*, 370 F.3d 565, 570 (6th Cir.2004).

■ Statistical evidence and testimony regarding specific instances of alleged discrimination may be used to establish pattern and practice discrimination. *International Brotherhood of Teamsters*, 431 U.S. at 340, 97 S.Ct. 1843; *Reap v. Continental Casualty Co.*, 199 F.R.D. 536, 542 (D.N.J.2001). Plaintiffs offer both in this case. They contend that their statistical and testimonial evidence demonstrates that Defendants employ a decision-making process that, in practice, is entirely subjective and is used to limit the rate of promotion for African–American employees relative to Caucasian employees. Plaintiffs rely solely upon testimonial evidence to meet their burden with regard to discharges.

The Court is not persuaded that Plaintiff's evidence establishes the necessary commonality and typicality to warrant class certification.

### 1. Statistical Evidence

■ Plaintiff contends that there are disparities in promotions within Level 1, from Level 1 to 2, and from Level 2 to 3. Plaintiffs rely heavily on the expert reports of John Van Wingen, Ph.D., which purport to show that there is a statistical disparity in the advancement of African–American employees who held the Management Trainee position at some point during their career with Defendants. Dr. Van Wingen concedes, however, that his (corrected) calculations only leads him to conclude that there is a statistical disparity in promotions from Level 1 to 2.[11]

---

11. In a "Reply" report, Dr. Van Wingen admits that computational errors in his initial report

caused him to erroneously conclude that there

For reasons discussed more fully below in the analysis of Defendants' *Daubert* motion, the Court finds that Dr. Van Wingen's reports do not clearly support even that assertion. The conclusions that Dr. Van Wingen offers in both his initial and supplemental reports are often convoluted, confusing and conclusory. Some of the deficiencies in his report include the fact that: he does not cite any authority for his methods despite Defendants' assertion, via their expert, that there is no scientific basis for some of Dr. Van Wingen's methods and conclusions; there are computational discrepancies within each report, some of which Plaintiffs were unable to reconcile during oral argument; inexplicably, Dr. Van Wingen in some instances includes in his analysis data outside the agreed upon time frame and, in one instance, does not include data for the full time frame; [12] and, he does not offer a cogent explanation for why it was not necessary for him to take into account the various differences among the regions with regard to the way in which promotions were handled. Aside from his bald assertions, neither of Dr. Van Wingen's reports clearly shows, *prima facie*, that there is a statistical disparity even in promotions from Level 1 to Level 2. "The value of statistical proof ... must be evaluated in light of the total circumstances present to a given case[,] and an incomplete or inextensive statistical analysis has little probative value." *Rowe v. Cleveland Pneumatic Co.*, 690 F.2d 88, 94 (6th Cir.1982). Plaintiffs have not met their burden with their statistical evidence.

### 2. Testimonial Evidence

■ Plaintiffs do not fare any better with their testimonial evidence. Plaintiffs rely solely upon testimonial evidence to support their claims of discrimination within Level 1, from Level 2 to 3, and in terminations. However, Plaintiffs have not shown that issues of law or fact are common and typical to persons employed in each of the seven regions.

Although all of the Plaintiffs were employed, at some point, as Management Trainees in Region W, there was no central deci-

sion-maker or uniform means of advancing. In fact, Plaintiffs do not dispute Defendants' assertion, which is supported by affidavits from the Regional Vice Presidents of the four Daily Rental regions, that: 1) each region decides what the criteria will be for evaluating candidates for promotions within the respective regions; 2) there are different decision-makers in each region who apply the criteria; and, 3) in addition to the subjective criteria, each region considers multiple forms of objective criteria.

Although Enterprise–Detroit issued general guidelines for Daily Rental regions in February or March of 2003, the Regional Vice Presidents of the Daily Rental regions state that they were free to deviate from the guidelines as necessary based on the needs of their areas. Prior to that, from October 2000 through February or March 2003, the criteria used in each region was not uniform. *See* affidavits attached as Def. Exhs. F–I. In Non–Daily Rental, the objective and subjective criteria was and is fashioned to address the unique characteristics of those positions.

Courts have found commonality and typicality lacking under similar circumstances. For instance in *Reyes*, the plaintiffs were employed by three separate departments within defendant's organization. Consequently, the Court noted:

> Each of these departments or divisions presumably have [sic] a different hierarchy of decision-makers, which means that each plaintiff or putative class member has his or her own set of unique circumstances surrounding the adverse employment action about which they now attempt to collectively complain. The instant case is the classic type with which courts are justifiably concerned over the very real danger of certifying a large class action which will thereafter most likely splinter into an unmanageable plethora of individualized claims.

176 F.R.D. at 658.

In *Reap v Continental Casualty Co.*, *supra*, plaintiffs sought to certify a class for sex

---

was also a statistical disparity in promotions from Level 2 to 3.

**12.** *See* Table 6 of Dr. Van Wingen's Reply report, which includes data from 1992 to 2002.

and age discrimination and retaliation. The plaintiffs alleged that they were discriminated against because of defendant's policy of delegating employment decisions to local supervisors, which allowed the supervisors to improperly use age and gender as a criteria. Local supervisors made decisions about hiring, promotion, salary, benefits, and termination. The proposed class would have covered approximately 5000 employees in 284 offices across the United States. The court declined to certify the class on other grounds, but in its analysis the court noted that:

> If we were to certify Reap's disparate treatment claims, we would be grouping together many unrelated employment decisions made by many individual supervisors against many individual plaintiffs. An analysis of these unrelated decisions would raise numerous individualized questions that are not amenable to generalized proof.

Likewise, in *Wright v. Circuit City Stores, supra,* the proposed class covered fifteen states, 125 to 160 stores and facilities, each of which had varying degrees of autonomy over hiring, evaluation, assignment, training, and promotion decisions. 201 F.R.D. at 540. Decisions were made by varying levels of management based on subjective criteria. *Id.* The Court declined to certify the class stating that "the purported class is comprised of a large group of diverse and differently situated employees whose highly individualized claims of discrimination do not lend themselves to class-wide proof." *Id* at 541.

Similarly, in this case, Plaintiffs propose a class that covers seven regions. However, each region is autonomous to some extent regarding promotion, discipline, and discharge decisions. And, decisions are made by varying levels of management, based on criteria selected by each region. Except for one, all of the Plaintiffs have only worked in Region W and have no direct knowledge of the criteria, procedures, or decision-makers in the other regions.[13] Additionally, although each Plaintiff claims to have been victim of

some type of negative treatment because of the subjective process, by their own account each of their situations varies with regard to what they experienced and by whom.

There is no evidence that the issues that Plaintiffs raise with respect to Region W are in fact common or typical to the remaining regions, or that adjudication of Plaintiffs' claims would advance the interests of putative class members who worked outside of Region W. Indeed, because there is no central decision-maker even within regions, Plaintiffs have not even demonstrated that there is a common or typical issue among those who worked in Region W. The mere fact that employees within and among regions may have all suffered racial discrimination is not sufficient. *General Tel. Co. v. Falcon,* 457 U.S. 147, 157, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *Wright,* 201 F.R.D. at 539. Plaintiffs failed to make the requisite showing through testimonial evidence.

### 3. Decision–Making Process

Because the group that Plaintiffs seek to certify is diverse, Plaintiffs can still establish commonality and typicality if they can show that Defendants' utilized an *entirely* subjective decision-making process that was discriminatory. The Supreme Court in *General Tel. Co. v. Falcon, supra,* stated in a footnote that classes which include a diverse (or "across the board") group of individuals can only be certified if there was significant evidence that the employer utilized a general policy of discrimination that manifested itself to class members "in the same general fashion, such as through entirely subjective decisionmaking processes." 457 U.S. at 159, 102 S.Ct. 2364 n. 15. Courts in this and other districts explicitly interpret this language as requiring plaintiffs seeking to certify broad classes to show that a defendant's decision-making process is *entirely* subjective. *Bacon,* 370 F.3d at 570; *Shipes v. Trinity Industries,* 987 F.2d 311, 316 (5th Cir.1993); *Appleton v. Deloitte & Touche,* 168 F.R.D. 221, 230 (M.D.Tenn.1996). "[Plaintiffs] must prove that the potential members of the class

---

**13.** The one Plaintiff who also worked for a time in Region R, only seems to complain about the treatment that he received in Region W.

actually have something in common: they are subject to random decision-making." *Bacon*, 370 F.3d at 572.

Plaintiffs' proposed class is diverse in that it would consist of any current or former African–American employee that ever held the position of Management Trainee after May 8, 1999. That would include: individuals who were promoted to various positions, and those who were not promoted to the same extent or at all; individuals who work or worked in any of the seven regions; and, supervisory and non-supervisory employees. However, in this case, the overwhelming evidence is that the decision-making process includes a number of objective criteria. Plaintiffs assert that the objective criteria are actually applied subjectively. However, Plaintiffs do not clearly demonstrate how this is so.

■ For example, Plaintiffs claim that their respective superiors arbitrarily denied them the opportunity to take the MQI, the test required to advance from Management Trainee. But, they do not dispute that the fulfillment of objective criteria, including a minimum number of power points, a minimum average daily insurance rate (ADIR), a minimum number of corporate leads, and a minimum number of car sale leads, was a prerequisite to taking the MQI. Also, for promotions to Levels 2 and 3, an employee is evaluated on objective factors such as branch performance in core areas (which are profitability, growth, employee development) and the ESQI.[14] Plaintiffs acknowledge that there is objective criteria and do not present any proof that it is actually applied such that it is stripped of all objectivity. Therefore, the *Falcon* rule does not apply to establish commonality and typicality.

For all of these reasons, Plaintiffs failed to show that there is one issue of law or fact, other than their general claim of race discrimination, that is common and typical for them and the putative class members. Therefore, Plaintiffs have not met the commonality and typicality requirements.

## b. ADEQUACY OF REPRESENTATION

The representative parties must "fairly and adequately protect the interests of the class." FRCP 23(a)(4). "This prerequisite is essential to due process, because a final judgment in a class action is binding on all class members." *American Medical Systems*, 75 F.3d at 1083. The adequacy of representation factor requires the Court to consider two criteria: "1) The representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Senter v. General Motors Corp.*, 532 F.2d 511, 525 (6th Cir.1976), *cert den*, 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976). *See also American Medical Systems*, 75 F.3d at 1083 (error for district court not to consider class representative's psychological problems); *In re K Mart Corp. Securities Litigation*, 1996 WL 924811, *5 (E.D.Mich.1996)(finding it significant that a proposed class representative demonstrated only a cursory knowledge of the litigation at issue).

"The adequate representation requirement overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentives to pursue the claims of the other class members." *American Medical Systems*, 75 F.3d at 1083. What distinguishes the adequacy of representation factor is that it also requires the court to consider the competency of the class counsel and to consider whether the representative and class have any conflicts of interest. *Id.* The Court must consider "whether there is any antagonism between the interests of the plaintiffs and other members of the class" and "the experience and ability of counsel for the plaintiffs." *Cross v. National Trust Life Insurance Co.*, 553 F.2d 1026, 1031 (6th Cir.1977).

Defendants do not question the experience and ability of Plaintiffs' counsel. However, they assert that there are actual and potential conflicts among the named Plaintiffs and putative class members. Specifically, Defendants assert that several Plaintiffs' own mis-

---

**14.** The ESQI is a numerical evaluation of a branch's customer service performance.

conduct creates conflicts of interest. Because several Plaintiffs were accused of wrongdoing on the job,[15] Defendants argue that there is an issue of whether a Plaintiff was denied a promotion, disciplined, or terminated as a result of discrimination or his/her own misconduct. Defendants contend that those Plaintiffs' interest in defending against allegations of wrongdoing would interfere with their ability to adequately represent the interests of the class.

Defendants also point out that certain Plaintiffs also acted in a supervisory capacity over other Plaintiffs and participated in the promotion process for those members. For instance, Plaintiff Brock wrote negative evaluations of Plaintiff Henderson for insubordination. Although Brock did not say how or if the negative evaluation affected Henderson's advancement, he admitted that such conduct typically can affect one's prospects for promotion. Brock also had a supervisory relationship over Starks, Bell, and Wells. Although he did not report any misconduct by these Plaintiffs, he gave Starks an overall mark of "needs improvement" on a performance evaluation and once gave Starks a warning. Plaintiffs Bly, Lois Wilson, and Michelle Wilson also received less than favorable evaluations from potential putative class members. Defendants assert that further potential for conflict exists because supervisors such as Brock were also responsible for areas that would be a prerequisite to a promotion, e.g., training and guidance. Therefore, Brock and others could be called by the defense as witnesses to refute claims by anyone they supervised.

Whether a conflict, in fact, exists when there is a diverse group of class members depends upon the facts and claims alleged. *Staton v. Boeing Co.*, 327 F.3d 938, 958 (9th Cir.2003). Defendants do not cite any authority for the proposition that the fact that it may be necessary for putative class members to defend against claims that they were not promoted or were discharged because of their own misconduct creates an irreconcilable conflict. However, courts have found that a conflict exists where certain members participated in the very behavior that is being challenged. For instance, in *Donaldson v. Microsoft Corp.*, 205 F.R.D. 558, 568 (W.D.Wa.2001), the court found that a conflict existed where two of the three named plaintiffs were former supervisors who were obligated to implement the supervisory system that was being challenged. Because the plaintiffs' claims were based upon the evaluation system that certain class members used to evaluate other class members, the district court said that it was "unable to envision a class which would include both those who implemented the ratings system and those who allegedly suffered under it." *Id.* Likewise, in *Appleton, supra*, there was a conflict where one potential class member claimed racial discrimination in an employment evaluation, but one of the supervisors who participated in the evaluation was also African–American and a potential class member. Here, the same conflict exists between named Plaintiffs and putative class members. Certain supervisor class members employed the very promotion procedures that Plaintiffs complain about. Those class members, therefore, are potential witnesses against other class members.

Citing *Butler v. Home Depot, Inc.*, 1996 WL 421436 (N.D.Cal.1996), Plaintiffs suggest that bifurcation of the trial could resolve potential conflicts. In *Butler*, the plaintiffs sought class certification for alleged employment discrimination via a subjective decision-making process. Defendant argued that certification should be denied because the class included supervisory and non-supervisory employees. The Court found that the diversity within the class could be remedied by bifurcating the case into a liability phase, addressing common issues such as injunctive relief, and a remedial phase, addressing indi-

---

**15.** Plaintiff Stabler was accused of and terminated for, improperly voiding a rental contract. Plaintiff Spencer was accused of and terminated for, *inter alia*, falsifying his time sheet. Plaintiff Bell was accused of and terminated for, taking a rental car without paying the full rental fee and failing to appear for work for one week. Plaintiff Michelle Wilson admits falsely stating on her resume that she had a college degree, and she was terminated, *inter alia*, for allegedly taking a car in violation of company policy, damaging it, and attempting to have the car repaired without reporting the accident.

vidual compensatory damage claims. In the remedial phase, the Court asserted that supervisors and non-supervisors would present individual claims for relief, but that during the liability phase the diversity would not present material conflicts. The *Butler* court suggested that any involvement that the supervisor class members had in the decision making process was minimal: "One Court has commented that 'an injunction against a few supervisory members of the class-who most likely did not exert significant influence over departmental policy-making-is fairly characterized as *de minimis* relative to the value of such an injunction in protecting these same supervisors from epidemic discrimination.'" 1996 WL 421436 at *7 n. 1.

■ Here, Plaintiff Brock admits that the same behavior that caused him to give negative evaluations of other class members can typically impact upon an employee's prospect for advancement. Therefore, it is foreseeable that supervisory class members such as Brock could legitimately be called to refute allegations of other members and testify that certain actions, such as negative evaluations or decisions not to promote, were for legitimate business reasons. Inasmuch as such testimony is against the interest of the entire class, it can hardly be viewed as *de minimis.* And, because it impacts upon the trier of fact's finding of liability, bifurcation into liability and damage phases will not resolve the conflict. Thus, because of the inherent conflict in this case among class members who acted in a supervisory capacity over other class members, Plaintiffs failed to show that they would adequately represent the proposed class.

In sum, Plaintiffs failed to make the requisite showing under FRCP 23(a). Therefore, it is not necessary for the Court to reach the question of whether certification would be proper under 23(b)(2) or (3). Plaintiff's Motion for Class Certification is denied.

### B. Plaintiffs' Motion to Strike Exhibit

Plaintiffs move to strike Exhibit P of Defendants' brief in response to their Motion for Class Certification. Defendants' response brief was thirty-five pages. Exhibit P was a seventeen page memorandum summarizing numerous cases cited by Plaintiffs in their motion. Plaintiffs contend that Exhibit P should be stricken because it is additional legal argument attached as an exhibit, in order to circumvent the page limit. Defendants assert that the exhibit is not additional legal argument, but a complete summary of the cases misrepresented by incomplete summaries given by Plaintiffs in an enormous string cite. Defendants argue that they should not have to waste numerous pages in their brief to rebut Plaintiffs' diluted and sometimes inaccurate characterizations of the holdings. Also, Defendants assert that Plaintiffs have suffered no prejudice, because no new arguments are asserted.

The Court **DENIES** Plaintiffs' motion, but admonishes both parties. Plaintiffs, indeed, listed the cases summarized by Defendants in a five-page string cite (Pls. br. at pp. 21–26). Plaintiffs purport to give a brief holding for each of the cases, but the summaries are woefully incomplete. Plaintiffs are admonished to refrain from string citing at all in the future, and it certainly should not be done to the extent that it was in this case. On the other hand, Defendants' summary goes farther than just providing a recitation of the facts of each case; they also claim to distinguish each case from the facts at issue here. This is legal argument and, effectively, added an additional seventeen pages to Defendants' brief. The Court also notes that, at Exhibit V, Defendants added a twenty-two page Addendum Statement of Plaintiffs' Individual Claims, which supposedly summarizes each of the Plaintiff's specific claims and cites evidence to refute those assertions. This, too, is tantamount to additional argument going to the merits. Defendants are advised that this is not a proper use of exhibits.

### C. Defendants' *Daubert* Motion and Motion to Strike Dr. Van Wingen's Reply Report

Defendants move to strike both of Dr. Van Wingen's reports[16] and exclude his testimo-

---

16. Defendants' motion focuses on Dr. Wingen's first report. But, they assert in a footnote that

ny, pursuant to Fed.R.Evid. 702.[17] Dr. Van Wingen prepared an initial report including his opinion on the statistical evidence. After Defendants' expert, Malcolm Cohen, Ph.D., prepared a report criticizing Dr. Van Wingen's opinions and pointing out computational and other alleged errors, Dr. Van Wingen filed a "Reply" report. In the Reply, Dr. Van Wingen responds to Dr. Cohen's criticisms, corrects the errors that he acknowledges, and includes some new and/or modified analyses.

Defendants assert that Dr. Van Wingen's initial and reply reports should be stricken and he should not be allowed to testify as an expert because he: 1) admits that he is not an expert in employment statistics; 2) has no educational background in employment statistics; 3) has no relevant experience in employment statistics; 4) used an incorrect formula when examining the data; 5) failed to conduct any examination of background facts; 6) inappropriately aggregated the data for the various regions without any factual or scientific reason for doing so; and, 7) deviated from methods previously used against a different Enterprise entity in Arkansas (in another case). Defendants also object to the Reply report because: 1) a reply report is not provided for in the Scheduling Order; 2) the report was not served upon Defendants until after the close of discovery, and then only as an exhibit to Plaintiffs' Motion for Class Certification; and, 3) per Defendants, admission of the report at this late date would materially prejudice them and impede their ability to properly defend themselves.

Plaintiffs concede that Dr. Van Wingen does not specialize in employment statistics, but asserts that such a specialty is not necessary. They also maintain that Dr. Van Wingen's methodology is sound despite his initial errors. Plaintiffs point out that Dr. Van Wingen admitted his computational mistakes and no longer relies on his earlier opinions.

In an affidavit, Dr. Van Wingen says that he and Dr. Cohen used common methodologies that anyone familiar with the field of statistics would understand. Because the methods are fundamental tools of analysis used by a plethora of academic disciplines, he says that no citation was required. He states that his reply report was in response to Dr. Cohen's criticisms and a refinement of his examination of what happened to Management Trainees.

For the reasons stated below, the Court finds that Dr. Van Wingen's proposed testimony does not meet *Daubert* standards and grants Defendants' motion to strike both reports and exclude his testimony. Defendants' motion to strike the Reply report on procedural grounds is moot.

The Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), held that it is the trial judge's responsibility to ensure that scientific expert testimony admitted pursuant to this rule is relevant and reliable. The Court later extended the standard to include testimony based on "technical" and "other specialized knowledge." *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Under *Daubert,* an expert must first establish his expertise by reference to knowledge, skill, experience, training or education. *Pride v. BIC Corp.,* 218 F.3d 566, 577–578 (6th Cir.2000). This requirement is to be treated liberally, but liberal interpretation, "does not mean that a witness is an expert simply because he claims to be." *Id.* at 577 (*quoting In re Paoli RR Yard PCB Litigation,* 916 F.2d 829, 855 (3rd Cir.1990)).

Second, the expert must testify to scientific, technical or other specialized knowledge. This requirement "serves to establish a standard of 'evidentiary reliability' or 'trustworthiness.'" *Id.* (citing *Daubert,* 509 U.S. at

---

the Reply report should also be stricken on the same grounds.

**17.** FRE 702 states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or edu-

cation, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

591, 113 S.Ct. 2786). Opinions based on scientific knowledge must be derived by the scientific method. *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786. Therefore, "[p]roposed testimony must be supported by appropriate validation-i.e., 'good grounds,' based on what is known." *Id.* It is not the Court's function to second guess the validity of an expert's asserted conclusions. *Pride,* 218 F.3d at 577. But, it must " 'determine whether the principles and methodology underlying the testimony itself are valid.' " *Id.* (*quoting United States v. Bonds,* 12 F.3d 540, 556 (6th Cir. 1993)). Several criteria a court should consider when evaluating the scientific validity of expert testimony includes:

> [T]he testability of the expert's hypotheses (whether they can be or have been tested), whether the expert's methodology has been subjected to peer review, the rate of error associated with the methodology, and whether the methodology is generally accepted within the scientific community.

*Id.* (*citing Daubert,* 509 U.S. at 593–594, 113 S.Ct. 2786).

The final requirement is that the expert offer relevant testimony that actually assists the trier of fact. "This condition goes primarily to relevance. 'Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.' " *Id.* at 591, 113 S.Ct. 2786 (quoting 3 Weinstein & Berger ¶ 702[02], p. 702–18).

■ Plaintiffs do not dispute that Dr. Van Wingen has no educational or professional background or experience in employment statistics. Instead, they imply that his background in other areas of statistics qualifies him to render a general opinion in any area, or at least in employment statistics. However, Plaintiffs do not present any evidence or authority which supports this proposition.

The reliability of Dr. Van Wingen's opinions are also questionable. First, his explanation of his methodologies and rationale are largely conclusory, with little or no explanation of the scientific or other authority on which he relies. He offers conclusions about data, but almost no insight into how he reached those conclusions. Consequently, it is virtually impossible for the Court to discern in any objective way the validity of Dr. Van Wingen's methodology.

Second, Plaintiffs offered little or no persuasive evidence that Dr. Wingen's "general statistical analysis" of the raw data, without regard to the particular facts of this case, is a valid or reliable means of determining whether Defendants engaged in a pattern and practice of discrimination. Defendants claim, and one would expect, that the particular workings of Enterprise–Detroit and its individual regions would impact upon the analysis. The uncontradicted evidence is that each region has a different means of assessing an employee's eligibility for promotion. Yet, Dr. Van Wingen admits that he did not take this into account, without clearly explaining why he feels that this information is not relevant. He also steadfastly asserts that it is not necessary to analyze the data by region. But, he does not refer to any authority for this position. Nor has he offered any authority to support his own method of analyzing the data.

Overall, Plaintiffs failed to establish that Dr. Van Wingen has the requisite educational or professional background to offer an opinion on whether there is statistical evidence of race discrimination in this case. And, because of the lack of clarity in his reports, it is not clear that Dr. Van Wingen's methodologies are, in fact, based on sound scientific or statistical principles. Defendants' motion to strike Dr. Van Wingen's reports and exclude his testimony is **GRANTED**, and their motion to strike the Reply report on procedural grounds is deemed **MOOT**.

## IV. CONCLUSION

The Court: **DENIES** Plaintiff's Motion for Class Certification; **DENIES** Plaintiff's Motion to Strike Exhibit P Attached to Defendants' Opposition to Plaintiffs' Motion for Class Certification; **GRANTS** Defendants' Motion to Strike Dr. Van Wingen's Final Report and to Exclude his testimony; and, deems **MOOT** Defendants' Motion to Strike Dr. Van Wingen's Reply Report.

**IT IS SO ORDERED.**